Thank you, Your Honor. May it please the Court. My name is Joseph Aliotto, Jr. I represent the Plaintiffs and Appellants, Truck-Rail Handling and Quality Transport, Inc. in this matter. This is a private civil antitrust action brought pursuant to Sections 4 and 16 of the Clayton Act. We are seeking injunctive relief as well as treble damages that resulted from injuries sustained by virtue of the defendant railroad's violations of Sections 1 and 2 of the Sherman Act. Under Section 1, we have alleged that the defendant participated in a per se illegal price-fixing agreement. Also under Section 1, we alleged a per se illegal tying arrangement. Our Section 2 claims include the attempt to monopolize, conspiracy to monopolize, and actual monopolization pursuant to the essential facilities doctrine. Below, the defendants moved the district court for summary judgment on all of the antitrust claims. We opposed that motion, and we also filed a cross-motion for summary judgment on all of the antitrust claims. In two separate decisions, the lower court granted the defendants' motion for summary judgment and denied the plaintiffs' motion for summary judgment and entered a judgment in favor of the defendant and against the plaintiff as to all claims. We are asking this Court to not only review the grant of summary judgment in favor of the defendants. We are also asking this Court to review the denial of summary judgment, which we moved the lower court for. Generally speaking, a denial of summary judgment is not a reviewable order. However, in this case, when it is coupled with the review of a grant of summary judgment, it is reviewable. We are asking the Court to do so here. We believe that there is no genuine issue of material fact that the defendant, in fact, did violate sections 1 and 2 of the Sherman Antitrust Act. Now, this is a large case, and it is factually complex. However, if there is one thing that the Court should take away, it is this, coercion. Fundamentally, this case is about coercion. It is about the use of power over land and terminal sites to force transloaders into abdicating their ability to price their own products. The defendant railroad used its power. Where in the record do we find the evidence that the railroad coerced any pricing by the transloaders or the drage and by the transloaders? The way that works, Your Honor, is... What evidence in the record is what I'm asking as to... I find, as I look through this, a hard time finding any involvement of the railroad in the setting of transloading prices. This is the key. The key is that the transload facilities at issue here are extremely unique. They are set, first of all, must be set right alongside the railroad, so that immediately narrows the universe of available facilities. They must be specially paved. They have moats dug around them to prevent the spillage, accidental spillage of hazardous materials. They must be specially permitted by local... This doesn't get... Oh, they can have all the power they want in their leases, but the question I raise is where is the evidence that the railroad set prices of the transloaders? So what the railroad did... Coerced prices of the transloaders. What the railroad did was, with this power over these specific types of leases, they said to the transloaders, unless you sign a transload service agreement, which we have referred to in the briefs as a TSA, unless you sign a TSA, you will lose your lease on the terminal site. If they lose their lease on the terminal site, the end result of that, Judge Canby, is that the transloader is run out of the market. Therefore, the coercion at issue is if you do not sign the TSA, then you will be run out of the market. Okay. Now, so far we haven't mentioned price. Now, the TSA has the transloader's prices inherent in it, and the railroad... They're the transloader's prices. But the railroad, Your Honor, at all times maintained veto power and the power to reject the prices of the transloader. And then that leaves the transloader to do business, set prices with people it's dealing with independently of the railroad. No, Your Honor, that's the key. If the transloader does not agree to the price that has been proposed by the railroad, because these facilities are so rare, they will lose the lease on the facility and literally be run out of the local market. But I think the initial question was, where is the evidence that the railroad indeed forced any price on the transloader? At page 19 of our brief, Your Honor. Not your brief. Where is the evidence? This is at the excerpt, volume 2, page 484. The question asked of the defendant railroad was as follows. For a bundled rate, when you're doing the bundled packet, you can veto the price suggested by the transloader for the transloading price part of it. Is that right? Answer, yes. What's the next couple of questions and answers? Next question is, okay, can the transloader veto your price for the rail portion? Answer, no. Question. And by transloader, I mean even in the instances where you've said before, transloader sometimes is someone who does both transloading and trucking. Sometimes the trucking company doesn't transload. Let me start over. To be clear, neither the transloader nor the trucker can veto the rail price in the bundled price. Is that right? Answer. If they price their portion of the rail, if they price their portion of the overall bundled price to where it's noncompetitive with truck, and then the transcript ends. So the result, Your Honor, is that the transloader has no say over what the railroad prices. However, the railroad has veto power over the prices that the transloader can charge. Now, as I said before, the key to the entire case comes to the coercion over the leases. If they, if the transloader refuses to price according to the judgment of the railroad, then the transloader suffers by losing its lease and being run out of the local market. Your Honor, let me emphasize this point with another quote also from one of the railroad executives. Question. Okay. But if you wanted to, if they suggested a price and you didn't want to go along with it, you wouldn't agree to it, then you could reject that price, couldn't you? Answer. If, in fact, we didn't feel that it was going to work in the marketplace, we could reject it. If they reject the price that is offered by the transloader, the end result is that the transload service agreement does not get signed. And without a transload service agreement signed, the transloader loses the lease on the terminal. And, again, the terminals are themselves very, very unique. They must be specially built and specially permitted. And without a terminal, a transloader cannot operate. So what is the market? The market in this particular case is transloading services. So let me provide, Judge Schroeder, let me provide you with a brief factual understanding. This case involves the long-distance rail shipment of bulk commodities, usually 1,000 miles or more, from the origin into local municipal markets. So the product will travel 1,000 or 2,000 miles even sometimes into a local transloading market. At that transloading market, in this case El Paso and in Denver, the product is removed from the train and placed onto trucks, where it is then shipped a very short distance, usually under 50 miles, to the end consumer. It is this portion, this transloading, this changing and trucking to the end consumer, that the railroad has never been able to control. What they've done in this case is they announced an intention to control the whole movement from door to door. And this entailed their attempt and their actual success in monopolizing the transloading, trucking local markets. So that's what they. Well, how many, as I understand it, there's a facility there at each station or whatever. Correct. So how many people traditionally would use that facility at the same time to unload, to transload the stuff off the train? If I understand it, it's just one. In Colorado. In each place. In the Colorado market, there was one facility called Big Lift. That facility had eight different transloaders on it before the acts that gave rise to the conduct that gave rise to this lawsuit. Afterwards, after the railroad put in what it called its consolidation plan, it announced an intent and it said, we do not intend to have more than one operator in one market. They kicked out all eight and replaced it with one, the co-conspirator in this case, Savage, in Denver. And the El Paso area was slightly different. El Paso consisted of four separate facilities. These facilities are operated by, can be operated by different, different parties. There are four separate leases. So on the four separate leases or five different places within the El Paso market, all four of them were canceled and all four of those, not some, but all four given to the other co-conspirator in this case, Stagecoach. Now, Stagecoach never signed a TSA, as I understand the record. Your Honor, when Stagecoach took over the leases, they responded to what the railroad termed an RFP, which was a request for proposal. And this request for proposal required both the signature of a TSA and also the signature of a lease. The lease that was attached to the RFP said if you don't sign the TSA, you do not get the leases. And it is the TSA, Your Honor, the TSA is the vehicle that the railroad uses to set the prices. Did Stagecoach ever sign one? There's no evidence that Stagecoach signed one or didn't sign one. The only evidence, Your Honor, in the record on that is that Stagecoach could not find the TSA in its files. I have seven minutes remaining. I'd like to reserve it for rebuttal.  May I please the Court? My name is Jeffrey Cross, and I represent the Burlington Northern Santa Fe Railroad. Let me answer a couple of the questions that were directed to Mr. Eliotto. There is no evidence, there is no evidence that any leases were terminated because of prices that transloaders gave to the Burlington Northern Santa Fe. Indeed, the undisputed evidence is transloaders were free to provide prices to Burlington Northern Santa Fe, free to withdraw those prices if they felt that the marketplace changed, free to select certain transload movements that they would price and those that they decided they did not want to price. But the veto language that Mr. Eliotto has referred to means that if Burlington Northern thought that the price was out of whack in the marketplace, it could say we're not going to submit that on a bundled rate to our clients. You can go ahead and negotiate separately on a unbundled move, but we decide we're not going to submit that on a bundled rate because it just is not competitive. In terms of stagecoach signing a lease, they did not sign a lease, and in fact, there are a number. You mean a TSA? A TSA, I'm sorry. And there are a number of transloaders throughout the system that have not signed TSAs. What the TSA was designed to do, Burlington Northern decided that there was a need in the marketplace to enable it to compete with trucks. Trucks really are the competitor of the railroads. To compete with the trucks, which can go door to door, can go door to door very easily. The truck can be tracked. A railcar could end up sitting in a yard waiting for a train to be put together and then go to another yard and wait for another train to be put together as it goes over a route. Trucks can move very quickly. They don't carry as much, but there's a lot of value. That is the competitor to the railroad. So the railroad decided, well, for those shippers that don't have facilities on the tracks or its consignee, its customer doesn't have facility on the tracks, if we could combine rail movement with the truck movement and offer them the option of one price, not require shippers to have one price, but the option of one price, then maybe we can compete. In fact, Mr. Shornow, the president of truck rail handling, the plaintiff, and QTI, the other plaintiff, admitted that there's a benefit to the shipper to having one price. We thought it was a competitive advantage. And in point of fact, in Big Lift or Denver, the transload terminal at Big Lift, only 66 percent of the shipments were bundled. In El Paso, only 3 percent. So shippers were electing the unbundled. I'd like to quickly address a couple of points that the plaintiffs made in their reply brief, which we, of course, didn't have a chance to respond to. A couple of points that I believe are mischaracterizations and misstatements of the record. First off, in terms of price fixing, the allegation of price fixing, their attack really is on the concept of this most favored nations clause that appears in certain leases, which says that we expect the lowest price that you offer anybody else. They assert in their reply brief that we never raised the most favored nations clause in the court below. That's not correct. It can be found at 2 S.E.R. 415 to 416, and the language in the brief below at that citation is virtually the same as in our appellate brief. I'd also like to address the issue that they raised in terms of the market  And one of the things that they argue is that in El Paso, they admit that they were able to go to the Union Pacific and operate a transload site in the El Paso market after they were terminated at the leases at El Paso. And I should say, by the way, that prior to their termination, they had all four leases. So they essentially had every one of the transloading trackage car spaces in El Paso. So they went to, after they were terminated, they went to the Union Pacific, but they alleged that the Union Pacific was not adequate, even though their President, Mr. Shornow, again admitted in his deposition that he could do everything at the Union Pacific that they could he could do at the Burlington Northern. But they argue in their reply brief, well, a large percentage, over 50 percent of the traffic into El Paso is locked, locked in to the Burlington Northern. And they cite a quotation in their reply brief from Mr. Grant Himbo, who was the purchasing agent for Nova Chemicals, supposedly that they were locked in. That passage does not reflect an accurate statement of the situation. And if I could point the Court to 3ER ‑‑ I'm sorry, 2SCR, 2SCR 565 to 567. In that testimony, I won't read it for the Court, but in that testimony, Mr. Himbo says, well, I could switch. I could switch as long as the station was different. So if you asked me the question, was I locked in to what's called an OD pair, or an origin destination pair, yeah, I was locked in by my contract. But if I could move down the road to another station, such as the Union Pacific Station in the region, I could make that switch. I'd also like to address quickly an issue that they raise in their reply brief in turning to the issue of whether trucks are, in fact, competition to the railroad. They are alternatives for shippers in the marketplace. And one of the things that we did is we cited a surface transportation board opinion where the surface transportation board approved the merger of Union Pacific and Southern Pacific. And in that opinion, they recognized that trucks really are the competition, and therefore, there is not going to be monopoly power in the marketplace because shippers could turn to trucks. In their reply brief, the plaintiffs attack that on the grounds that, oh, we forgot to tell the Court. In fact, their brief, they say, we purposely forgot to tell the Court that what it is referring to are Gulf Coast traffic. Now, in reality, when one reads that portion, what the surface transportation board was referring to is traffic that originated, that the source of the traffic was in the Gulf Coast. Now, the plaintiff's big product that they transload are plastic rosin pellets that are used in extruding plastic. And when you look at a declaration that the plaintiff's filed called the GOSH declaration, which is found at 3ER702, it's clear that they source customers from the Gulf Coast, customers from Maryland, Louisiana, Point Comfort, Texas, Houston, Texas, Deer Park, Texas, into El Paso. In fact, of his list of 20, nine of his customers in El Paso came from the Gulf Coast, plastic rosin manufacturers that shipped into El Paso. So under the STBs, the surface transportation board's opinion, those could go to all truck. Counsel, they say that under the TSA, that A, in order to use your facility at all, just to come into your facility, they have to sign the TSA. And under the TSA, you can designate what price they will charge.  Now, A, when you gave the lease to, what is it, Stagecoast, for example, did that mean that they were not permitted to use it unless they also signed a TSA or what? Yes. We want a question. I'm just trying to figure out what the structure is from your standpoint, what you think the structure of that is. We wanted them to sign a TSA. And Mr. Aliota was correct. The RFP indicated that we wanted them to agree to sign a TSA. Yes. Again, all the TSA does is to say we would like you to offer to us prices that you would transload so that we can turn around and offer them to shippers as a bundle price. You're still free to do that. Suppose they say nuts. Pardon? Suppose they say nuts to that. Pardon? Suppose they say nuts to that. Well, I'm not going to offer you those kinds of prices. In point of fact, they did. Yeah. Then what? Nothing's happened. Excuse me? Nothing has happened, Your Honor. When you say nothing has happened, vis-a-vis whom? Stagecoast? Vis-a-vis Stagecoast. All right. So Stagecoast said, nope, we're not going to sign the TSA, let's say. Right. And as I said, there are many transloaders who have not signed the TSA in our system. Stagecoast is the one that has leased, say, on Facility X. Where is that leased? Which facility? Stagecoast. In El Paso, Your Honor. In El Paso. Okay. Anybody else have a lease on that facility? Not at Burlington Northern's facilities, although truck rail leasing is allowed to use that facility. That's my question. Truck rail leasing can use the facility in what sense? They can transload and truck from that facility. What's the advantage to Stagecoast in having a lease on the facility? Well, because they're the operators of the facility. I mean, truck rail handling has to go through Stagecoast. So, for example, there's a limited number of trackage space. So if truck rail handling all of a sudden had 50 cars arrive that were 45 cars more than the space, then Stagecoast was able to sort of operate to say, you've got too many. We'll try to accommodate you, but we can't accommodate you for all of them. If I'm Stagecoast, the reason I would like to have the lease is what? I have the trackage that I can then operate my transloading. Now, I'm truck rail out here, and this is Stagecoast. So Stagecoast has a lease. What's the disadvantage to truck rail in the fact that Stagecoast has a lease? Well, the disadvantage is they cannot transload at their will on that particular trackage. However, they were able to transload on the Union Pacific's trackage by signing the lease with the Union Pacific. They can also transload on that trackage, I think you said. Okay. But they have to go through Stagecoast. Right. Why is that a significant disadvantage, that they have to work through Stagecoast? I don't think it is. They may think it is, but I don't think it is. I mean, it's like any facility that we choose to give someone a lease, but the same thing happens. Let me go back the other direction again. If it's no disadvantage to them to have to go through Stagecoast,  because Stagecoast has the right to put cars there, and if they fill up the trackage with their cars, then no one else can use that trackage. If they don't fill up the trackage, another transloader has to come to them and say, can we use your trackage? So the disadvantage to truck rail is that Stagecoast, if it wanted to or could, could fill the trackage the whole time, and it sort of has first call on the trackage. Sure. Is that what it is? Sure. Okay. So there is some disadvantage. You said there was none a second ago. There is some disadvantage. I suppose you could say that that's a disadvantage. Let me also say this, Your Honor, that there are within 50 miles of El Paso, there are approximately ten transload sites, only four of which Burlington Northern owns, and there are ten transloaders. In addition... That wasn't what I was trying to penetrate. I was trying to find out if, A, you're telling us, I think, if the one who gets the lease, like Stagecoast, doesn't want to sign a TSA, they don't have to. Is that right? That's correct. So I believe you're saying that the record will show us that the lease is not let on the basis that you will sign a TSA. It's let on some other basis. That's correct, Your Honor. In fact, in the court below, while we conceded for purposes of summary judgment that we terminated them because they refused to sign the TSA, in point of fact, we don't think that's correct. But that's the record. That's what we have to deal with in terms of the record. Right. So the record is if you won't sign the TSA, you get terminated. Is that right? The record is that if truck rail handling did not sign the TSA, they were terminated. But if somebody else wouldn't sign the TSA, they wouldn't be terminated. That's correct, Your Honor. And that is, in fact, the record. That is, in fact, true that there are many people out there who have not signed the TSA. Could I get to what do you regard as the markets that we're dealing with in this case? We believe that the market is the shipment of bulk commodities, and, therefore, the players in that market are railroads, if you can go door-to-door, railroads and trucks, such as the UP and truck rail handling in El Paso, Burlington Northern and Stagecoach, or all trucks. Therefore, the players in the bulk transportation of goods are all these players. And that's significant from an antitrust perspective, Your Honor, because from an antitrust perspective, the issue is when you do the cross-elasticity of demand analysis that this court in Rebel Oil requires, and you do the cross-elasticity of supply analysis. And, by the way, this court in the Tenet case also requires that you do that analysis in response to super competitive prices. In other words, prices above the market level. You don't do it in terms of what actually exists. Have they increased prices above competitive levels, then what would happen? Would they be able to go, shippers be able to go to other alternatives? Then you don't have market power. If new people were able to come into the market and build transload facilities, then you don't have market power. And our belief is with that market, which would be the tying market and the tie, that there is no showing of market power and summary judgment is appropriate. What do you regard as their, I guess they talk about the tied market as well, and that would be transloading services? I think transloading services is the tied market. There's quite a bit of confusion as to what the tying claim here is, Your Honor. And, in fact, the judge in the court below, Judge White, believed that the tying market was transload facilities and the TSA. I think in their reply briefs, the plaintiffs now narrowed down the tying market to two tying models. One is they allege that it is, they are transload facilities and transload services. The other, they actually in footnote number two of their reply, set forth a second tying market, the second tying market that fits more closely in the model of Tuolumne and the Jefferson Parish case. And that is our rail system as the tied product and the transloaders on the sites of our rail transload, which is closer to the Tuolumne Hospital and OB doctors in the Tuolumne case or in the Jefferson Parish. So if you wanted to use the, I forget, the Sonoma County Hospital in Tuolumne, you had to use their OB guidance. And that's closer to the model. Thank you. You have used your time. Okay. Any further questions? Thank you. Good morning, Your Honor. Judge Fernandez, I'd like to get to one of the points that you were making. The counsel for the defendant just stated a moment ago that truck rail handling is able to use the facilities in El Paso. Thank you. That's not correct. The facilities in El Paso are what are called, quote, closed facilities. This is the testimony of the President and CEO of Stagecoach. This is at volume two of the excerpt of record, page 505, lines 17 through 22. Quote, I look at the track, and this is the way I view the track. That track, all track that I lease. And I control basically who has access to get cars or who can unload off of there. And I use it pretty much all for my own purposes. I'd like to get to another point that was made earlier as well, and that is that transloaders are free to charge prices of their choosing. They say that this is a free, arm's-length deal to negotiate the TSA. It is as arm's-length a deal as it is if you were negotiating a contract with one party holding a gun to the other party's head. You provide me a price. Go ahead, provide me a price. If you don't provide the right price, you will not only fail to negotiate and complete this contract, the failure to negotiate and complete this TSA will result in you being eliminated from the marketplace. The other point that counsel said that is not entirely accurate is that even if the transloader or the shipper does not like the bundled price that's offered by the transloader under the TSA, that it can go offer a lower price to the shipper, unbundled, indirectly. In essence, that the TSA holder can compete against the bundle. Again, that's not accurate. Both Stagecoach and Savage both agreed with the railroad to keep their bundled prices the same as their unbundled prices. This is at page 21 and 22 of our brief and at volume 3 of the excerpt of record at page 684. Quote, question, but I mean the pricing that you submitted in the transload agreement, was that supposed to cover the prices that you would be charging for bundled and for unbundled? Answer, I would say yes. Yes for what we knew at the time. Well, you have the favored nations clause. I recognize that the transloader cannot sell more cheaply than the price it offers to the railroad. What is the competitive injury of the railroad wanting to get a low price quote from the transloader? The competitive injury, Your Honor, results in a combination of not only the ability of the railroad to fix the prices, but also the ability of the railroad to exclude all competitors from the market. All competitors from the market? Correct, Your Honor. They want competitors who will offer lower prices. What they're able to do is in El Paso and both in El Paso and in Denver, the railroad was able to consolidate the transloading market so that only one transloader was available in each market. When there was one transloader in that market, they then raised the price of transloading. You know, it's hard for me to understand how you can talk about a market, a discrete market for every part of the country. Sure. When, with respect to these particular services, where what we're talking about is transporting goods from one area to the other. Yes, Your Honor. Let me address that. Yes. This is laid out in very, very factual, precise language, and the facts are outlined in depth in the brief. However, the nature of transloading is that it allows shippers to use the low-cost option of rail shipment. And if I am a consignee that is located off of the rail, I don't have access to the rail. So the whole point is to bring the shipment long distances, 1,000 miles or more, via rail. And then when the material is transloaded, it is then trucked a local distance. I do understand that. All right. Now, if they wanted to then truck it 500 miles, that makes no sense. They would have simply shipped it on rail closer to that destination. The result of this is that each of these small municipal markets are literally located all over the United States. But there are ways under the kind of antitrust analysis to define a market. Correct. And that requires the analysis of the cross-elasticity and other things. And there's a technique for doing this with, you know, hypothetical price rise and stuff. And if I understand the district court, it just said that the evidence of that wasn't there to define the market. Your Honor, we have outlined in depth the evidence that analyzes cross-elasticity of demand, cross-elasticity of supply, and barriers to entry in the brief. We did an analysis on what would happen with a hypothetical monopolist if they were to increase the price in the transloading services. The result was that we found that the next available alternative in these different markets was 80%. The price would have been 80% higher. Therefore, a monopolist could have raised its transloading prices by up to 80% without forcing shippers to switch. That is the evidence that we have very, very carefully and minutely outlined in the brief. The transloading market is the transloading market and the cross-elasticity of demand and supply is outlined very carefully, Your Honor, at the beginning of page 69 in the brief. The evidence is too voluminous for me to go through. However, it does a very careful analysis of the prices that are offered for transloading and that a hypothetical monopolist would be able to increase its prices by some 80% without any, without the closest available alternative taken. That section of your brief refers to the expert testimony that establishes that. No, Your Honor. Not just the expert testimony, but evidence that's found in the record itself, pricing evidence.  Your time has expired. Thank you, Your Honor. Thank you, counsel. The use of target is submitted for decision. That concludes the Court's calendar for this morning. And the Court stands adjourned. And I will add that we will return for some of the members of the audience after we've conferred. Thank you. Court is adjourned.
judges: Schroeder, Canby, Fernandez